IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION


MARY ELAINE FARLEY,

          Plaintiff,

v.                                         CIVIL ACTION NO.   2:13-cv-17090

UNITED STATES OF AMERICA,

          Defendant.


**MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On January 22, 2011, Plaintiff Mary Elaine Farley fell while stepping on a patch of ice in the parking lot of the United States Post Office located in Mount Carbon, West Virginia, sustaining a triple-fracture and dislocation of her right ankle.

Plaintiff brings this action under the Federal Torts Claims Act ("FTCA"), 28 U.S.C. §§ 2671–80, to recover damages from the United States for the injuries she sustained.   Plaintiff alleges that the United States was negligent in the maintenance of the Mount Carbon Post Office parking lot and in its failure to warn post office customers of its hazardous nature.   (Compl. ¶ 6, ECF 1.)   After exhausting her administrative remedies as required by 28 U.S.C. § 2401(b), Plaintiff filed her Complaint on July 3, 2013.   This Court is vested with subject matter jurisdiction inasmuch as Plaintiff seeks to recover damages for an alleged tort of the employees of a federal agency.   *See* 28 U.S.C. § 1346(b)(1).

October 14, 2014, the Court entered a Memorandum Opinion and Order denying the

1

United States' motion for summary judgment.   *Farley v. United States*, No. 2:13-CV-17090, 2014 WL 5149709 (S.D.W. Va. Oct. 14, 2014).   A bench trial was held on October 28, 2014. At trial, Plaintiff testified on her own behalf and also called as witnesses her husband Steve Farley, Mount Carbon post office workers Amy Whiteside and Linda Black, and safety expert James McIntosh.   The United States called Dr. Carrie Lakin, Plaintiff's treating podiatrist.   On December 19, 2014, the parties submitted their proposed findings of fact and conclusions of law.

In accordance with Fed. R. Civ. P. 52(a)(1), the Court makes the following findings of fact and conclusions of law.

## I. Findings of Fact

The following discussion represents the Court's findings of fact as to liability.   Each finding is made by a preponderance of the evidence.

### A.        The Post Office

In January 2011, the Mount Carbon Post Office had two employees.   Amy Lynn Whiteside, the Postmaster, worked weekdays, when the post office was open from 7:30 a.m. to 4:30 p.m.   Linda Black, the Postmaster Relief, worked when Ms. Whiteside was gone—primarily on Saturdays—when the post office was open from 8:00 a.m. to 11:00 a.m.. On their respective work days, Ms. Whiteside and Ms. Black were responsible for sorting the mail, placing letters into the Mount Carbon Post Office's approximately 200 to 225 P.O. boxes, and running the counter open for customers to buy stamps and drop off mail.

The Mount Carbon post office was equipped with a wheel-chair accessible ramp leading to the entrance.   At the bottom end of the ramp was an area marked with diagonal stripes, next to which was located the parking lot's only designated handicapped parking spot.   (Ex. 1, 3, 8,

9, 10, 14; Tr. 22–23, 53.)    The area marked with diagonal stripes is intended to give handicapped individuals extra room to exit their vehicles.    (Tr. 23–24.)

The Mount Carbon post office does not employ a custodian, and, aside from their other duties, Ms. Whiteside and Ms. Black were also responsible for caring for the walkways and removing snow and ice on their respective work days.    (Tr. 18, 39, 47.)    As of January 22, 2011, Ms. Whiteside and Ms. Black had not been provided with any written instructions or guidelines regarding snow and ice removal.    (Tr. 26–27.)    Ms. Whiteside testified that "I know you have to remove the ice and salt [*sic*].    I know that."    (Tr. 27.)    She testified that it was a matter of common sense.    (Tr. 27.)    She also testified that Ms. Black, who had approximately 30 years of experience at the Mount Carbon Post Office, (Tr. 42–43, 53; *see also* Tr. 31), knew that she needed to apply salt and take care of the parking lots (Tr. 31).    Similarly, Ms. Black testified that she and Ms. Whiteside viewed it as important to take care of snow and ice and that Ms. Whiteside had in the past come to the post office on Saturdays to assist Ms. Black with shoveling and cleaning the parking lot.    (Tr. 55.)

As of January 22, 2011, only one particular type of salt was available at the Mount Carbon post office.    (Tr. 27–28.)[1]    Ms. Whiteside orders salt from eBuy, an internal ordering system used by the U.S. Postal Service.    (Tr. 34–35; *see also* Tr. 46.)    She testified that she generally ordered the same salt every time, referencing her previous order.    (Tr. 34–35.) According to an eBuy invoice, on January 4, 2011, Ms. Whiteside received a shipment of a 40 pound "pail" of "CALCLRD BLND MAJIC MELT ICE MELT," composed of a calcium,

---

[1]  As used herein, "salt" refers to any type of material used to melt ice (*see* Tr. 36).

potassium, and sodium chloride mix.   (Ex. 15 at 1–2.)[2]   The Court finds that this was the salt

available at the post office on January 21 and 22, 2011.   There is no evidence indicating the

temperature to which this salt should have been expected to be effective prior to its use on

January 21 and 22, 2011.   (*See* Tr. 92–93.)

As of January 22, 2011, the Mount Carbon Post Office did not have available any signs

or placards warning of a slippery floor, wet floor, or other hazardous surface.   (Tr. 29, 49.)

**B.      The Ice**

It had rained throughout the day in Mount Carbon on Thursday, January 20, 2011.   (Tr.

16.)   That night temperatures dropped and the rain turned to sleet, and by the morning of

Friday, January 21, 2011, it had snowed a bit.   (Tr. 16–17, 19; *see also* 120.)   According to

Ms. Whiteside, the temperatures did not rise above eight degrees Fahrenheit on Friday, January

21, 2011.   (Tr. 16.)   When Ms. Whiteside arrived for work at the post office on that Friday

morning she observed that the parking lot and walkways had areas covered in a thin layer of

snow with ice underneath.   (Tr. 19, 29.)   She applied salt to the ramp, the sidewalks, and the

parking lot and also scraped those areas with a shovel.   (Tr. 19, 39.)     She went back out at

around 10:00 a.m. and again at lunchtime to apply more salt, (Tr. 19–20), applying salt three

times in all, (Tr. 30).   Ms. Whiteside's normal procedure is then to remove the melted residue

(Tr. 32).   However, she testified that "it was just so cold, nothing was working," (Tr. 19), "it

wasn't melting," (Tr. 32).   Ms. Whiteside left a bucket containing the salt by the front door for

Ms. Black to access the next day when she came to work.   (Tr. 31, 44.)

The morning of Saturday, January 22, 2011, was again very cold.   Ms. Black estimated

---

[2]  According to another invoice, a shipment of the same product in the same quantity was received again on March 10, 2011 (Ex. 15 at 3–4).

that the temperature in Mount Carbon was around zero degrees Fahrenheit or below that morning. (Tr. 45; *see also* Tr. 52.) Ms. Whiteside recalled that after the sun came up the temperature was around nine degrees and that there was a high of fifteen degrees that day. (Tr. 17.) Although there was no overnight precipitation, (Tr. 17, 45), it was still very icy out in the Mount Carbon area, (Tr. 45; *see also* Tr. 42). When Ms. Ms. Black arrived for work at the post office on that morning, (Tr. 43–44, 55), she noticed that the sidewalk and ramp were clear, (Tr. 54, 56–57), a fact that she attributed to Ms. Whiteside's scraping and salting the day before, (Tr. 54). However, she noticed that the parking lot was very icy all over. (Tr. 29, 45, 53–54.) The bucket of ice awaited Ms. Black by the front door. (Tr. 31, 44.) Before the post office opened, (Tr. 55–56), Ms. Black shook more salt from a scoop onto the parking lot, (Tr. 45–46). However, "it didn't melt." (Tr. 46.) In fact, salt from the day before was still visible on top of unmelted ice in the parking lot. (Tr. 45–46, 56.) Ms. Black made no attempt to scrape any slush or ice off of the parking lot, because, although she could tell that it had been scraped the day before, "it was ice" and "would not scrape." (Tr. 46–47.) Ms. Black did not make a second attempt to go back outside to apply salt or to see if there was slush or any melted ice. (Tr. 50–51.) She testified that she was "very busy inside." (Tr. 50.) Ms. Black did not place any sign in the parking lot warning customers of slippery conditions.

## C. The Fall

At approximately 10:45 a.m. on Saturday, January 22, 2011, (Tr. 61), Plaintiff arrived at the Mount Carbon Post Office driving her minivan, (Tr. 123). Her minivan had a handicapped placard attached to the rearview mirror, (Tr. 123),[3] and Plaintiff backed into the post office's

---

[3] Plaintiff, a fifty-five-year-old (Ex. 12) resident of Mount Carbon, West Virginia (Tr. 115) and a registered nurse, (Tr. 110; see also Tr. 122), suffered from Charcot Joint, a condition which can cause severe joint destruction in the

handicapped space, (Tr. 123).   Plaintiff was aware that the weather in the previous days had

been very bad, that it had snowed, and that it was "very, very cold" that day.   (Tr. 120.)   She

backed into the handicapped parking space as opposed to simply pulling in forward because she

knew that the parking lot was icy, (Tr. 144),[4] and wished to have a shorter and more direct path

from her driver's side door to the handicapped ramp, (Tr. 123–24, 154–56).

Plaintiff testified that she "opened the car door . . . and put both of [her] feet down on the

ground", then slipped and fell.   (Tr. 126.)

Plaintiff testified that, after falling, she noticed that "it looked like black ice in that area."

(Tr. 126–127; *see also* Tr. 142, 144.)   She recalled that "[i]t didn't look obviously icy" where

she had stepped but that from the ground "you could see it was glazed."   (Tr. 127.)[5]

As a result of the fall, Plaintiff suffered a dislocation and trimalleolar fracture of her right

ankle (meaning that it was fractured in three places).   (Ex. 12; *see also* Tr. 132, 135.)   Plaintiff

---

foot and sometimes lead to instability and a greater likelihood of falling, (Tr. 102–05).   Plaintiff also suffered from peripheral neuropathy, an abnormality of the nerve function that may impair the ability to walk and lead to a greater likelihood of tripping, as patients may be unable to sense where their foot is in space.   (Tr. 105.)   Dr. Carrie Lakin, a podiatrist, had treated Plaintiff for her conditions since 2009 (Tr. 109).   Based on complaints about "plantar fasciitis, heel/arch pain, [and] unstable ankle" in May 2010, Dr. Lakin prescribed Plaintiff orthopedic shoes. (Tr. 108.)   Dr. Lakin testified that Plaintiff had not complained to her of falling prior to January 22, 2011.   (Tr. 110–11.)   Plaintiff testified that she has been "really doing well" prior to January 22, 2011.   (Tr. 117.)   She recalled having had no recent problems with stumbling or falling and no serious falls within the last seven or eight years.   (Tr. 118.)   Plaintiff's husband, Steven Farley, also testified that leading up to January 22, 2011 Plaintiff had not recently had any major fall incidents or a propensity to fall or to trip over things.   (Tr. 158.)   On January 22, 2011, Plaintiff was wearing her prescribed orthopedic shoes.   (Tr. 119.)

[4] Plaintiff agreed with the United States that she had testified in her deposition that she backed into the parking space because the parking lot was icy.   (Tr. 144.)

[5] The Court accepts as true Plaintiff's testimony to the extent that she suggests that she did not observe the iciness of the spot on which she stepped prior to her fall and that it was not immediately obvious from her vantage point. This is consistent with Plaintiff's generally credible demeanor and with the precautions Plaintiff took to avoid walking an unnecessary distance in the icy parking lot.   At the same time, there is no other evidence that the spot was covered in black ice or that the ice was not visible.   To the extent that Plaintiff suggests that that the ice was invisible or hard to observe, courts "generally consider self-serving opinions without objective corroboration not significantly probative," *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996), and any suggestion that the ice was invisible is belied by Plaintiff's admission that from another vantage point the glazed surface was patent.

underwent surgery, and a metal plate and screws were inserted into her ankle.   (Ex. 12; *see also*

Tr. 139–42.)

**D.      Expert Testimony**

Plaintiff presented testimony from safety expert James McIntosh, a professor of safety

technology at Marshall University and certified safety professional and industrial hygienist.

(Ex. 11.)   Mr. McIntosh was asked to render an opinion concerning whether reasonable care

had been applied at the Mount Carbon Post Office on the date of Plaintiff's fall.   (Tr. 59.)   Mr.

McIntosh based his opinion on the in-court testimony of the two postal employees and his review

of the parties' court filings, certain investigative notes and photographs, weather history, certain

U.S. Postal Service safety standards, and certain other safety standards.   (Tr. 60.)

Mr. McIntosh testified that "the slippery condition of the handicap parking space on

January 22nd, 2011 was obvious and known to the Postal Service at the Mount Carbon Post

Office."   (Tr. 60.)   Mr. McIntosh opined that the Mount Carbon Post Office had a duty either

to clean and remove the ice, to restrict access to the handicapped parking space, or to provide a

warning to customers.   (Tr. 61, 98.)   Mr. McIntosh opined that the post office had sufficient

time to do so.   (Tr. 61.)

Mr. McIntosh also testified that not having in place an established snow removal plan and

not training employees on written materials or guidelines creates an increased and foreseeable

risk of injury due to failure to comply with guidelines.   (Tr. 65, 71, 73.)   He testified that, had

Ms. Black complied with internal post office guidelines, she would have rechecked the parking

lot for refreezing or removal of slush.   (Tr. 71.)   He further testified that it was foreseeable that

a handicapped person would exit their vehicle in the marked area adjacent to the handicapped

parking space and might have trouble walking, and that, therefore, that area should receive particular attention in case of snow or ice.   (Tr. 70–71; *see also* Tr. 89.)

Mr. McIntosh testified that he would have recommended the use of "[c]alcium chloride, anhydrous type, in pellet form" or "calcium chloride in flake form," salts recommended in a U.S. Postal Service internal guideline for the removal of snow and ice on roadways and sidewalks. (Tr. 76; *see also* Ex. 6.)   Mr. McIntosh testified that his "independent research" indicated that both of those salts are effective to approximately twenty-five degrees below zero.   (Tr. 63.) Mr. McIntosh also appears to have testified that "Glacier Melt" or "Calcium Chloride" perhaps should have been the salt used at the Mount Carbon Post Office.   (Tr. 75–76.)[6]   To the extent that Mr. McIntosh suggested this, his testimony is somewhat inconsistent.   Mr. McIntosh testified that either of the latter two salts would have been expected to be effective on the day of Plaintiff's injury.   (Tr. 75, 91.)   Mr. McIntosh did not express an opinion as to whether the salt actually used by the United States would have been expected to be effective or ineffective on the day of Plaintiff's injury.   (Tr. 92–93.)

---

[6]  The U.S. Postal Service's "Material Logistics Bulletin" issued June 4, 2003 was introduced into evidence.   That document purports to announce that, pursuant to a contract with High Country Chemical Supplies Inc., High Country is the mandatory source for all orders of de-icing products in excess of ten bags or more and that eBuy is the preferred channel for placing such orders.   (Ex. 7 at 1.)   The bulletin describes three distribution zones identified by the High Country and shows that West Virginia falls into Zone 1.   (Ex. 7 at 7–8.)   The bulletin further identifies two de-icing products available for purchase from High Country in Zone 1: (1) "Glacier Melt," described as a formulation of a sodium chloride and magnesium chloride mixture which will melt ice and snow to minus 10 degrees Fahrenheit, and (2) "Calcium Chloride," described as a formulation of calcium chloride which will melt ice and snow to minus 25 degrees Fahrenheit.   (Ex. 7 at 6.)   However, the bulletin also specifies that orders of less than ten bags are outside of the scope of the contract and must be purchased from other sources.   (Ex. 7 at 1.)   It appears that the salt used at the Mount Carbon Post Office on January 22, 2011, was neither "Glacier Melt" nor "Calcium Chloride" and may have been a product outside of the scope of the contract that was the subject of the bulletin.

Mr. McIntosh was asked whether "Glacier Melt" or "Calcium Chloride" were the only products available to the Post Office in Mount Carbon.   (Tr. 75.)   He replied as follows: "I'm not sure of that. That's the -- I'm -- I've not heard testimony in that regard, but what I've heard is, this is what should have been used, one of these two products."   (Tr. 75.)   To the extent that Mr. McIntosh's opined that "Glacier Melt" or "Calcium Chloride" should have been used, it appears to be based on a misreading of the bulletin, which does not mandate that all post offices located in Zone 1 use "Glacier Melt" or "Calcium Chloride."

## II. Conclusions of Law

Pursuant to the FTCA, the United States is liable in tort to the same extent as a private individual under the law of the place where the act or omission occurred. *See* 28 U.S.C. § 2674. *See also Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001). Because Plaintiff alleges that the purported negligence occurred in West Virginia, the Court is bound to apply West Virginia's substantive law.

> In a negligence suit, a plaintiff is required to show four basic elements: duty, breach, causation, and damages. The plaintiff must prove that the defendant owed the plaintiff some duty of care; that by some act or omission the defendant breached that duty; and that the act or omission proximately caused some injury to the plaintiff that is compensable by damages. When we say that a defendant is "negligent," we are merely saying the defendant owed some duty of care to another yet failed to abide by that duty.

*Hersh v. E–T Enters., Ltd. P'ship*, 752 S.E.2d 336, 341 (W. Va. 2013).

In premises liability negligence cases, an owner or possessor of land owes any non-trespassing entrant upon the premises a duty of "reasonable care under the circumstances." Syl. Pt. 4, *Mallet v. Pickens*, 522 S.E.2d 436, 437 (W. Va. 1999) (abolishing the distinction between invitees and licensees in West Virginia). "Possessors of property do not have a duty to eliminate every potential hazard; they only have a duty to take reasonable steps to ameliorate the risk posed by the hazard where it is foreseeable that harm is likely to result from the hazard." *Hersh*, 752 S.E.2d at 348.

> In determining whether a defendant in a premises liability case met his or her burden of reasonable care under the circumstances to all non-trespassing entrants, the trier of fact must consider (1) the foreseeability that an injury might occur; (2) the severity of injury; (3) the time, manner and circumstances under which the injured party entered the premises; (4) the normal or expected use made of the premises; and (5) the magnitude of the burden placed upon the defendant to guard against injury.

9

Syl. Pt. 4, *id.* (citing Syl. Pt. 6, *Mallet*, 522 S.E.2d at 437).

At the time of Plaintiff's injury, the law in West Virginia provided that, because a person lawfully upon the premises of another assumes all "normal, obvious or ordinary risks attendant on the use of the premises," the owner/occupier has no duty to warn of or protect against "dangers that are obvious, reasonably apparent, or as well known to the person injured as they are to the owner or occupant." *Estate of Helmick by Fox v. Martin*, 453 S.E.2d 335, 339 (1994) (quoting *Burdette v. Burdette*, 127 S.E.2d 249, 252 (W. Va. 1962)). *Accord McDonald v. Univ. of W. Va. Bd. of Trs.*, 444 S.E.2d 57, 59–60 (1994); Syl. Pt. 1, *Sesler v. Coal Co.*, 41 S.E. 216 (W. Va. 1902).

In 2013, while this case was pending, the Supreme Court of Appeals of West Virginia abolished the open and obvious doctrine, holding that a plaintiff's failure to exercise reasonable care in the face of an obvious hazard goes instead to the fact-finder's evaluation of comparative negligence. *Hersh*, 752 S.E.2d at 339. The Court stated that "if it is foreseeable that an open and obvious hazard may cause harm to others despite the fact it is open and obvious, then there is a duty of care upon the owner or possessor to remedy the risk posed by the hazard," but that, on the other hand, "the finder of fact may consider whether a plaintiff failed to exercise reasonable self-protective care when encountering an open and obvious hazard" as an "element to be considered" in apportioning the comparative negligence of the parties. *Id.* at 349.[7] The parties

---

[7] The Court explained that, "[p]ut simply, the obviousness of a dangerous condition should inform a fact finder's assessment of the parties' comparative negligence, rather than dictate dismissal by the court as a matter of law." *Id.* at 343. The Court in *Hersh* thus "subsumed [the open and obvious hazard doctrine] into considerations of comparative fault," *Scaggs v. United States*, Civil Action No. 2:14-cv-19304, 2015 WL 4276286, at *3 (S.D.W. Va. July 14, 2015) (Copenhaver, J.), as part of a broader trend of "the comparative fault concept . . . subsum[ing] . . . a number of doctrines which [had] operated as a complete bar to [a] plaintiff's recovery" prior to West Virginia's abolition of strict contributory negligence, *Tug Valley Pharmacy, LLC v. All Pls. Below In Mingo Cnty.*, 773 S.E.2d 627, 635 & 635 n.12 (W. Va. 2015) (citing cases). *See also Hersh*, 752 S.E.2d at 346.

acknowledged *Hersh*'s abrogation of the open and obvious doctrine and treated it as applicable to this case. (*See* Def.'s Proposed Findings of Fact & Conclusions of Law at 6, ECF 56; Integrated Pretrial Order at 4, ECF 38.) The Court therefore proceeds under the same assumption.[8]

Effective February 18, 2015, while this case was still pending, the West Virginia Legislature "reinstate[d] and codifie[d] the open and obvious hazard doctrine" to its status prior to *Hersh*. *See* W. Va. Code § 55-7-28.[9] In West Virginia, "[t]he presumption is that a statute is intended to operate prospectively, and not retrospectively, unless it appears, by clear, strong and imperative words or by necessary implication, that the Legislature intended to give the statute retroactive force and effect." Syl. Pt. 4, *Taylor v. State Comp. Comm'r*, 86 S.E.2d 114, 115 (1955). *Accord Roderick v. Hough*, 124 S.E.2d 703, 707 (1961) ("[R]etroactive or retrospective legislation is not favored, in the absence of any words expressing a contrary intention.") (citation omitted). *See also Ryan v. Clonch Indus., Inc.*, 219 W. Va. 664, 667, 639 S.E.2d 756, 759 (2006) (noting that in West Virginia the law in existence at the time of the injury applies; citing cases). The Court does not find that the text of the statute clearly indicates that the Legislature intended to give the statute retroactive effect, nor does the Court find that such an intent is necessarily implied.[10] Therefore, the Court finds that W. Va. Code § 55-7-28 has no

---

[8] *See also Kruis v. Allmine Paving, LLC*, Civil Action No. 3:13-CV-25, 2014 WL 6775557, at *4 (N.D.W. Va. Dec. 2, 2014) (Groh, J.) (treating *Hersh*'s abolition of the open and obvious doctrine as applicable to an injury sustained in 2011). *Cf. Bradley v. Appalachian Power Co.*, 256 S.E.2d 879 (1979) (providing factors for a court to consider in determining whether a decision by the Supreme Court of Appeals of West Virginia overruling previous law should be afforded retroactivity to pending cases).

[9] The United States has not taken a position on the applicability of § 55-7-28 to this case. (*See* Def.'s Notice of Suppl. Auth. at 1, ECF 58.) Plaintiff has argued that it does not apply retroactively. (*See* Pl.'s. Resp. to Def.'s Notice of Suppl. Auth. at 1–3, ECF 59.)

[10] W. Va. Code § 55-7-28(c) provides as follows:

application in this case.[11]

Plaintiff argues that the United States had a duty to remove the ice adjacent to the handicapped parking space, or, otherwise, to warn its customers of the ice or to restrict access to that area until such time as the ice was removed.   (*See* Pl.'s Proposed Mem. Op. & Order Containing Ct.'s Findings of Fact & Conclusions of Law & Granting J. to Pl. at 20, ECF 57). The Court finds that, given the extreme cold and evident general iciness of the parking lot, the United States did all that was reasonable under the circumstances.

The United States did not have a duty under the circumstances to do more to remove the ice than it did.   The post office employees repeatedly attempted to de-ice the parking lot on the day of and before the fall, but the ice did not melt due to the extremely low temperatures. Scraping proved to be similarly futile.   There is no evidence that more salt or scraping would have remedied the slippery conditions in the parking lot.   Curiously, it seems that the post office employees' efforts met with some success on the sidewalk and ramp.

Plaintiff has suggested that the United States had a duty to have available salts that would have worked at the extreme temperatures present on the day of Plaintiff's injury.    However, Plaintiff has not put forth sufficient evidence to prove that the United States was negligent in stocking the salt that it did.   Although Mr. McIntosh testified that a number of salts would have

> It is the intent and policy of the Legislature that this section reinstates and codifies the open and obvious hazard doctrine in actions seeking to assert liability against an owner, lessee or other lawful occupant of real property to its status prior to the decision of the West Virginia Supreme Court of Appeals in the matter of *Hersh v. E-T Enterprises, Limited Partnership*, 232 W. Va. 305 (2013).   In its application of the doctrine, the court as a matter of law shall appropriately apply the doctrine considering the nature and severity, or lack thereof, of violations of any statute relating to a cause of action.

[11] *Cf. Scaggs v. United States*, Civil Action No. 2:14-CV-19304, 2015 WL 4276286, at *3 (S.D.W. Va. July 14, 2015) (Copenhaver, J.) (treating the open and obvious hazard doctrine as applicable where the parties agreed that W. Va. Code § 55-7-28 restored the doctrine and treated it as applicable).

been expected to be effective on the day of Plaintiff's injury, neither Plaintiff's expert nor any other witness testified as to whether the salt actually stocked and used by the Mount Carbon Post Office would have been expected to be effective or ineffective on the day of Plaintiff's injury (*see* Tr. 92–32).[12]

Plaintiff argues that, if the United States was unable to remove the ice, it had a duty to restrict access to the handicapped parking space until such time as the ice was removed. However, the Court does not find that it would have been prudent under the circumstances to have closed the only handicapped parking space available, when that would merely have forced disabled post office customers to navigate a larger distance over an icy parking lot in order to access the handicapped ramp.

Plaintiff argues that the United States had a duty to have in place a written plan to deal with the scenario confronted by Ms. Black on the morning of Saturday, January 22, 2011, rather than leaving her to use her common sense.   However, the Court cannot find that a two-person operation required a written safety plan or that Plaintiff has shown that lack of a plan was a cause of Plaintiff's injury.   Rechecking the parking lot for refreezing or removal of slush would not

---

[12] Mr. McIntosh testified that his "independent research" indicated that both of the salts referenced the U.S. Postal Service's internal guideline for the removal of snow and ice are effective to approximately 25 degrees below zero. (Tr. 63; see also Ex. 6.)   Plaintiff also points to the internal U.S. Postal Service bulletin describing two de-icing products available for bulk purchase in West Virginia, which claims that the products are effective to approximately 25 and 10 degrees below zero, respectively.   (Ex. 7.)   These temperatures appear to be lower than the lowest temperatures on the day of Plaintiff's injury.   However, as the temperature rating for the salt actually used by the United States is not known, the Court will not infer the salt had a temperature rating that would make it foreseeable that the salt would fail to melt the ice or that such a rating was known to the United States.   Such a conclusion may well be undercut by the undisputed testimony that by Saturday morning, the sidewalk and ramp were clear.   In addition, in the absence of any evidence corroborating the actual versus claimed efficacy of the other products under conditions similar to those on the day of Plaintiff's injury, the Court takes claims about their efficacy made by their manufacturer and by Mr. McIntosh based on unspecified research with a grain of salt.   Asked if either one of the two products listed in the bulletin would have been able to melt snow and ice in Mount Carbon on the day of Plaintiff's injury, Mr. McIntosh responded only, "That's what this document says, correct." (Tr. 75.)   Mr. McIntosh did not disclose the basis for his independent research about the efficacy of the other two salts, and it, too, may have been based on manufacturer claims that the Court has insufficient evidence to assess.

13

have made a difference where, as here, the ice apparently did not melt.

Finally, the United States did not have a duty to put up a sign warning of the ice on which Plaintiff slipped because the ice was open and obvious.   The primary inquiry, under *Hersh*, is whether the possessor of property took "reasonable steps to ameliorate the risk posed by the hazard where it is foreseeable that harm is likely to result from the hazard."   *Hersh*, 752 S.E.2d at 348.   However, *Hersh* provides additional guidance as to whether a land possessor owes a duty to warn of an open and obvious danger.   In that case, the Supreme Court of Appeals of West Virginia declined the plaintiff's invitation to adopt wholesale the RESTATEMENT (SECOND) OF TORTS § 343A(1) (1965), but noted that the Court "find[s] the rule and its accompanying notes and comments to be instructive."   762 S.E.2d at 347.   Section 343A(1) provides:   "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness."   The Court in *Hersh* quoted Section 343A(1) with apparent approval, noting that that section "recognizes that if a hazard is open and obvious, then a warning by the possessor ordinarily will not provide additional protection against harm."   *Hersh*, 752 S.E.2d at 345.   *See also id.* ("Risks that are known, open, or obvious already provide notice to those who might be exposed to the risk, making a warning superfluous.") (quoting RESTATEMENT (THIRD) OF TORTS, PHYS. & EMOT. HARM § 51 cmt. k (2010)); *id.* at 346–47 ("The modern and controlling law on this subject is that '*although the obviousness of a danger may obviate the duty to warn of its existence*, if it is foreseeable that the danger may cause injury despite the fact that it is obvious (e.g., when necessity requires persons to encounter it), there may be a duty to remedy the danger, and the breach of that duty

14

may in turn form the basis for liability[.]") (alteration in original) (emphasis added) (footnote omitted).

While Plaintiff testified that the spot in which she fell did not look obviously icy, she admitted that it was possible upon inspection to see that the ice had a glazed appearance.   Even if the ice was black ice, the Court of Appeals of Michigan, persuasively, has held that black ice may constitute an open and obvious hazard where there are "indicia of a potentially hazardous condition," including "specific weather conditions present at the time of the plaintiff's fall." *Slaughter v. Blarney Castle Oil Co.*, 760 N.W.2d 287, 483 (Mich. Ct. App. 2008).[13]   Here, it was apparent that the temperature was well below freezing, that there had been precipitation in the preceding days, and that generally icy conditions prevailed in the post office parking lot—indicia that black ice may have been present in addition to ice or snow that was easier to see.   The Court finds that it was foreseeable that these obvious conditions would put a non-trespasser on notice of the potential for harder to see ice, making a warning superfluous. This conclusion is reinforced by the fact that it was foreseeable that post office customers would visit the parking lot during the day time, when the ice would be easier to discover.   Further, Plaintiff's own expert testified that the slippery condition of the handicapped space was obvious. (Tr. 60.)

Accordingly, the Court **FINDS** that, even under *Hersh*, the Plaintiff has not proved by a preponderance of evidence that the United States did not meet its duty of reasonable care under the circumstances.   The conditions were tough, as well as apparent, and the United States did all

---

[13] *See also, e.g., Kelly v. Waffle House, Inc.*, Civil Action No. CA 6:11-3441-HMH, 2012 WL 5238385, at *4 (D.S.C. Oct. 23, 2012) (genuine issue of material fact existed as to whether black ice was an open and obvious hazard); *Powers v. Tirupathi Hospitality*, LLC, Civil Action No. CIV.A. 10-1-JGW, 2011 WL 251001, at *2 (E.D. Ky. Jan. 26, 2011) (same).

that was reasonable under the circumstances.

### *III. Conclusion*

Based upon the foregoing, the Court **FINDS** that the United States is not liable to Plaintiff for negligence.   Judgment will be entered for the United States and the case will be removed from the Court's docket.   A separate Judgment Order will enter this day implementing the rulings contained herein.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        September 30, 2015

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

16